Case 4:20-cv-00043-MFU-JCH   Document 23   Filed 12/07/21   Page 1 of 19
Pageid#: 964

CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
DEC 07 2021
JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| JAMES B.,[1] | ) | |
|     Plaintiff, | ) | Civil Action No. 4:20-cv-00043 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:   Joel C. Hoppe |
| Commissioner of Social Security | ) |         United States Magistrate Judge |
|     Defendant.[2] | ) | |

    Plaintiff James B. asks this Court to review the Commissioner of Social Security's final decision denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings, and the applicable law, I cannot find that the Commissioner's final decision is supported by substantial evidence. Accordingly, I respectfully recommend that the presiding District Judge reverse the decision and remand the case under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

    The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Commissioner Kijakazi is hereby substituted for the Commissioner of Social Security as the defendant in this action. *See Bethea v. Astrue*, 455 F. App'x 145, 146 (3d Cir. 2011); 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

1

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a).[3] Social Security ALJs follow a

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

James applied for DIB in April 2017 and applied for SSI in November 2018, *see* Administrative Record ("R.") 157–58, 166–73, ECF No. 14, alleging disability because of heart disease and a back injury, R. 58. He initially alleged that he became disabled on October 9, 2012, R. 50–51, 185, and he later amended his alleged onset date to June 19, 2016, R. 180. James turned fifty years old, making him a person "closely approaching advanced age" under the regulations, 20 C.F.R. §§ 404.1563(d), 416.963(d), on his amended alleged onset date. *See* R. 50. Disability Determination Services ("DDS"), the state agency, denied his DIB claim initially in June 2017, R. 50–55, and upon reconsideration in January 2018, R. 58–66. The record does not show that DDS rendered a determination on James's SSI claim.

On July 17, 2019, ALJ H. Munday issued an unfavorable decision on both disability claims after a hearing at which James appeared with counsel and testified. R. 7–18, 35–42. First, she found that James had not engaged in substantial gainful activity since June 19, 2016, and that

he met the Act's insured-status requirements through June 30, 2016.[4] R. 12. At step two, ALJ Munday found that James had four severe impairments: ischemic heart disease, hyperlipidemia, degenerative disc disease, and obstructive sleep apnea. *Id.* At step three, ALJ Munday concluded that none of James's impairments, considered both alone and in combination, met or equaled any relevant Listing. R. 13–14 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.04, 3.09, 4.04). ALJ Munday then evaluated James's residual functional capacity ("RFC") and determined that he could perform "light" work[5] with additional limitations. R. 14–16. He could occasionally stoop, kneel, crouch, crawl, and climb; and he could tolerate occasional exposure to vibrations and hazardous conditions (including unprotected heights and moving machinery). R. 14.

Based on this RFC finding and the vocational expert's ("VE") hearing testimony, ALJ Munday concluded that James could not return to his past relevant work as a tractor-trailer driver, dump truck driver, or auto mechanic. R. 16. Nonetheless, ALJ Munday found at step five that James could perform the requirements of certain light, unskilled occupations (cashier, fast food worker, inspector) that existed in significant number of jobs in the national economy. R. 16–17; *see* R. 46. ALJ Munday therefore found James "not disabled" from June 19, 2016, through the date of her decision, and she denied his applications for benefits. R. 17. The Appeals Council denied James's request for review, thereby making ALJ Munday's July 2019 written

---

[4] The latter date is called the date last insured, or "DLI." *See Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012). "To qualify for DIB, [James] must prove that [he] became disabled prior to the expiration of [his] insured status." *Johnson*, 434 F.3d at 655–56. James's insured-status is not relevant to his SSI claim. *See Redditt v. Colvin*, No. 7:13cv391, 2014 WL 2800820, at *4 n.3 (W.D. Va. June 18, 2014); 20 C.F.R. §§ 416.202, 416.501; R. 17–18.

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

decision "the final decision of the Commissioner" denying James's DIB and SSI claims. R. 1–3. This appeal followed.

## III. Discussion

James argues that ALJ Munday's RFC finding is not supported by substantial evidence. *See generally* Pl.'s Br. 4–12, ECF No. 19. Specifically, he argues that ALJ Munday (1) failed to account for his lumbar impairments in assessing his RFC, *id.* at 4–5; (2) failed to properly evaluate his credibility regarding pain and functional limitations caused by his neck and back impairments, *id.* at 5–9; and (3) failed to obtain a medical opinion regarding James's RFC, *id.* at 9–12. James's first argument is persuasive. Accordingly, I address his other arguments only briefly.

A.   Summary

   1.   *Relevant Treatment Notes*[6]

In June 2017, James presented to Phyllis Scarce, F.N.P., at the Free Clinic of Danville, reporting pain in his lower back and groin. R. 493. He also had "throbbing" right hip pain, right leg weakness and heaviness, and right foot numbness that had been a problem for "a while." *Id.* He reported that he could not stand for a long time and that he was "unable to work or do a lot of anything" because of his back pain. *Id.* Nurse Scarce observed significant tenderness and guarding in James's mid- to lower-abdomen and suprapubic region; straight leg raises to forty degrees on the left and to thirty degrees on the right, with pain in the lower back; and normal monofilament time in James's bilateral feet. *Id.* She ordered a spinal MRI and diagnosed low back pain with radiculopathy. *Id.* The MRI revealed a "[b]road-based disc bulge with cranial and

---

[6] James's first argument is that ALJ Munday failed to consider his lumbar spinal impairments and associated symptoms and instead discussed only those records pertaining to his cervical spinal impairments in assessing his RFC. Pl.'s Br. 4–5. Accordingly, I summarize only those medical records pertaining to James's cervical and lumbar spinal impairments and associated symptoms.

5

caudal migration at the L4-5 level" and "resulting severe bilateral neuroforaminal narrowing with findings concerning for a lateral exiting nerve root compression," for which a surgical consultation was recommended. R. 503 (June 23, 2017). The MRI also showed "[b]ilateral moderate neuroforaminal narrowing at L5-S1 with findings concerning for exiting nerve root compromise," "[m]ild to moderate thecal sac stenosis multifactorial [] at the L4-5 level," and "[m]ild to moderate multifactorial thecal sac stenosis at L3-4." *Id.* On the MRI results, Nurse Scarce handwrote: "needs spinal surgical consult ASAP." *Id.*

James returned to the Free Clinic on July 5. R. 491. He again reported leg pain, right lower leg heaviness and numbness, difficulty standing, and lower back pain that extended down his right leg to his ankle. *Id.* Nurse Scarce observed that James ambulated and changed positions slowly and cautiously; she administered an injection of Depomedrol in James's left deltoid and diagnosed chronic low back pain and a bulging disk with concern for nerve root compromise. *Id.* She prescribed prednisone and told James to complete some paperwork as soon as possible for an evaluation at the University of Virginia ("UVA") of his spinal stenosis and nerve root compromise. *Id.* Two weeks later, James returned and reported "no change in [his] pain or numbness [with] prednisone." R. 490. He had faxed paperwork to UVA's Spine Center, but he had not received a response. *Id.* Accordingly, during James's appointment, Nurse Scarce called the Spine Center, which explained that James needed to contact UVA's financial department with further information before scheduling an appointment. *Id.* In late August, James returned to the Free Clinic for a six-week follow up. R. 489. His back pain and right leg pain and numbness/tingling persisted, and James explained that he had "good days" and "bad days." *Id.* The day of his appointment was a "good day" because he had limited his activity over the preceding couple of days. *Id.* On exam, Nurse Scarce observed an overall healthy appearance

6

and full strength in James's bilateral lower extremities. *Id.* She again diagnosed chronic lower back pain with radiculopathy and referred James to an orthospinal specialist. *Id.*

In October, James presented to S. Evan Carstensen, M.D., at UVA, for right leg and back pain. R. 473. Although he reported that both issues had been affecting him for seven years, James's "pain ha[d] become severe" and had begun to affect his "desired lifestyle." *Id.* James rated his pain at a six out of ten in severity, explained that it radiated from his back to his posterior thigh and to the anterior portion of his leg, and noted that it was worse with standing, sitting, and walking but "generally improve[d] with rest." *Id.* James also complained of bilateral arm pain and neck pain that was worse with lifting and better with rest. *Id.* He explained that he had been taking over-the-counter pain medication without much relief and that no course of treatment (including non-steroidal anti-inflammatory drugs ("NSAIDs"), non-weight bearing exercises, physical therapy, and epidural steroid injections ("ESI")) had provided lasting relief. *Id.* On exam, Dr. Carstensen observed normal gait without any assistive devices; no spinal tenderness to palpation, step off, or obvious midline deformity; fingerbreadth chin to chest neck flexion; 15 degree neck extension; full extremity strength; 2+ bicep and patellar reflexes; negative straight leg raises; 2+ dorsalis pedis and posterior tibial pulses bilaterally; and painless hip range of motion. R. 475. A lumbar X-Ray showed "[m]oderate disc degenerative changes at L4-L5, with [] probable chronic ossific fragments in the right L4-L5 neural foramen." R. 481. Dr. Carstensen noted that James's MRI showed a "large herniating disc about L4-5 leading to neuroforaminal stenosis," recommended a steroid injection, noted that surgery "might be an option down the road" if injections failed to provide relief and James's symptoms progressed, and ordered an MRI of James's cervical spine. R. 475–76; *see also* R. 476–77 (administering a right L4-5 transforaminal ESI). The MRI results revealed "[m]ultilevel degenerative findings

7

superimposed on an intrinsically narrow central spinal canal," "severe central spinal canal stenosis from C3-C4 through C5-C6 with findings suspicious for cord myelomalacia," and "[s]cattered neural foraminal stenosis, worst at C5-C6 w[h]ere it is severe bilaterally." R. 483.

In November 2017, James returned to UVA's Spine Center and presented to Hamid Hassanzadeh, M.D., reporting that his symptoms were "largely unchanged since his last visit." R. 478. He noted back and right lower extremity pain of equal intensity, which had not improved with ESI, as well as bilateral arm and neck pain. R. 478–79. Dr. Hassanzadeh observed a stable gait without assistive devices, full upper extremity motor strength, 2+ upper extremity reflexes bilaterally, and negative Hoffman's signs bilaterally. *Id.* He also reviewed James's cervical MRI results and diagnosed myelopathy. R. 479. Because James's cervical MRI showed that his "spinal cord [was] compressed," which created a risk for paralysis without intervention, Dr. Hassanzadeh recommended cervical spinal surgery. *Id.* He also explained that "myelopathy and its progression are unpredictable." *Id.* Accordingly, he did not know whether surgery would "improve or change" James's condition or help him "regain any of his previous functionality." *Id.* ("We explained that the goal of surgery would be to decompress the affected nerves and spinal cord to prevent further damage, and that we cannot predict to what extent his symptoms will improve, if at all. We also emphasized that surgical intervention has historically been able to more consistently ameliorate upper/lower extremity symptoms than axial neck/back pain."). Later in November, James returned to the Free Clinic. R. 488. He had no complaints "except for lower back pain" and he told Nurse Scarce that he was "just dealing with it" until his upcoming surgery. *Id.* Nurse Scarce observed a "healthy appearance" and 1+ pitting edema in his lower extremities. *Id.* She again diagnosed chronic low back pain with radiculopathy and prescribed Tylenol and Advil as needed for pain. *Id.*

In January 2018, James presented to UVA's Spine Center for a pre-operative work-up. R. 519. Rosemarie Tyger, PA-C, noted that James "continue[d] to endorse bilateral arm pain (75%) and neck pain (25%)." *Id.* She observed a normal gait without assistive devices; no palpable tenderness, mass, or boney abnormalities in James's cervical spine; normal cervical flexion, extension, rotation, and lateral bend; intact sensation and full strength throughout the bilateral upper extremities; well-perfused extremities; negative Hoffman's, Spurling's, and arm abduction signs; no clonus; and 2+ upper extremity reflexes. R. 521; *see also* R. 538–41 (making similar findings at a subsequent pre-operative visit in February). A new cervical MRI continued to show "[c]ervical degenerative changes" and "[s]cattered foraminal stenosis." R. 697. In March, Dr. Hassanzadeh performed a C3-T2 decompressive PSIF and C4/C5/C6 laminoplasty "to address cervical stenosis and myelopathy." R. 560; *see also* R. 554–56.

In April, James returned to UVA's Spine Center. R. 623. Dr. Hassanzadeh noted that James denied "any numbness/tingling or other myelopathic signs," was "doing very well with resolution of his arm pain," and "just note[d] some soreness in the mid scapular region." *Id.* He also observed full upper extremity strength and noted that James's most recent cervical X-Rays showed "[g]ood instrumentation placement." *Id.*; *see also* R. 712. Overall, James was still "doing well," was "very pleased with his surgery and recovery," and showed no evidence of complications or neurological deficits. *Id.* In July, James returned to UVA's Spine Center for another follow-up appointment. R. 624–25. Dr. Hassanzadeh noted that James was "doing well overall from an upper extremity and myelopathy standpoint," was "no longer having significant arm pain," and had "good improvement" of his bilateral upper extremity numbness/tingling. R. 624. Dr. Hassanzadeh also noted, however, that although James was "symptom-free" at "one point after surgery," he now felt the "return of symptoms similar to before surgery." *Id.* He had

9

left elbow "residual aching" and numbness, hand tingling, and "shooting" right lower extremity pain and aching. *Id.* Dr. Hassanzadeh counseled that James's surgery "was indicated to slow the progression of the disease, not necessarily to make him better," and noted that his myelopathy and pain did "seem to have improved." R. 625. On the other hand, he observed that James was now "most bothered" by right lower extremity "shooting pain and aching," which was "likely from his lumbar spine." *Id.* Noting that James's 2017 lumbar MRI showed "a large disc herniation at L4-5" and that a transforaminal lumbar ESI had not provided relief, Dr. Hassanzadeh referred James for an interlaminar lumbar ESI. *Id.*

In October, James returned to UVA's Spine Center. R. 755–56. Dr. Hassanzadeh noted that although James "was initially doing very well after surgery," he felt that his condition was "worsening." R. 755. James endorsed neck stiffness, right-sided numbness/tingling in the upper and lower extremities, right leg pain, and difficulty standing for more than twenty minutes. *Id.* An ESI did not provide any relief. *Id.* Dr. Hassanzadeh observed full upper and lower extremity strength, R. 755, and an updated cervical X-Ray showed "[g]ood instrumentation placement" with "[n]o evidence of instrumentation complications, loosening, or failure," R. 756. *See also* R. 717. Dr. Hassanzadeh explained that James's "leg pain and standing intolerance [was] related to" his L4-5 disc herniation and recommended another injection and physical therapy. R. 756 ("Otherwise, there is nothing much to do at this point."). James declined further ESI, *id.*, and the record does not show that he participated in physical therapy, *see* R. 15.

Finally, in June 2019, James returned to UVA's Spine Center. R. 763–64. Dr. Hassanzadeh observed that James was "doing well" and was "[h]appy with [the] results" of his cervical spinal fusion. R. 763. James reported "[s]ome occasional neck and whole body pain," but Dr. Hassanzadeh was "[n]ot sure of [its] exact etiology." R. 764. He noted that James's pain

10

"[c]ould be due to fibromyalgia given the whole body component, or could be fatigue related." *Id.* Dr. Hassanzadeh explained that James's neck pain was likely related to his surgery, "considering the nature of the procedure" and the "overall magnitude of the surgery itself." *Id.* He advised physical therapy and noted that he would not recommend further "major intervention." *Id.*

    2.    *James's Statements*

In July 2019, James testified before ALJ Munday. R. 35–42. He explained that because of his "back situation," he could not stand for more than about an hour. R. 38. He could comfortably lift twenty or thirty pounds, he had difficulty bending over because of "[f]our herniated discs in the lower lumbar" region, and he had difficulty standing up from a squatting position. R. 39. James also had pain "constantly everyday" on the right side of his body because of the herniated disc in his lumbar back. R. 39–40. He explained that he had spinal surgery, but that his doctor told him the surgery would "relieve pressure," not "fix the problem." R. 40. James testified that he could sit for about an hour at a time and had difficulty getting up after lying down. *Id.* He could vacuum, take out the trash, and handle most of his personal care independently, but he had difficulty cooking because he got a "deep burning sensation" in the back of his legs when standing for about fifteen to twenty minutes. R. 41. James could drive, but he "ha[d] to be cautious" because he had difficulty turning his head over his shoulder. R. 42.

B.    *The ALJ's Decision*

ALJ Munday found that James had severe impairments of ischemic heart disease, hyperlipidemia, degenerative disc disease, and obstructive sleep apnea. R. 12. At step three, ALJ Munday determined (as relevant here) that James's severe "back disorder" did not satisfy Listing 1.04 because his "record establishe[d] neither evidence of lumbar spinal arachnoiditis nor

11

positive straight leg tests with loss of spinal range of motion, atrophy, and sensory or reflex loss," and James could "walk without the use of assistive devices occupying both upper extremities." R. 13.

ALJ Munday then assessed James's RFC. *See* R. 14–16. She concluded that he could perform "light" work with additional limitations. *Id.* ALJ Munday summarized James's subjective statements about his pain and related functional limitations, and she determined that although his "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." R. 14 ("The claimant alleges that he is disabled by his back and cardiac condition."); *see also* R. 15. ALJ Munday then briefly summarized James's medical history and determined that James's "improvement with treatment, conservative follow up treatment after surgery, and largely unremarkable examinations and medical imaging" supported her RFC assessment. R. 15–16. Based on her RFC finding and the VE's testimony, ALJ Munday determined that James could not perform his past relevant work as a tractor-trailer truck driver, dump truck driver, or auto mechanic. R. 16. Nonetheless, because he could perform other jobs existing in significant numbers in the national economy, she determined that he was "not disabled" from June 19, 2016, through the date of her decision. R. 16–17.

C.     Analysis

    1.     *ALJ Munday erred by failing to consider James's lumbar spine impairment*

James argues that ALJ Munday failed to consider his lumbar spine impairments. Pl.'s Br. 4–5. He asserts that she failed to discuss his lumbar disc herniation and related impairments, including "radiating pain and numbness in his right leg," in her RFC assessment. *Id.* at 4. "To the

12

extent [ALJ Munday] discussed [James's] pain from his spinal impairments," James argues that she did so "in reference to his *cervical* spine" rather than his lumbar spine. *Id.* at 5. I agree.

A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his medical impairments and related symptoms.[7] SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "functional limitations or restrictions caused by medical impairments and their related symptoms," including pain, that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016). The ALJ has broad (but not unbounded) discretion to determine whether an alleged symptom or functional limitation is supported by or consistent with other relevant evidence, including objective evidence of the underlying medical impairment, in the claimant's record. *See Hines*, 453 F.3d at 564 n.3; *Perry v. Colvin*, No. 2:15cv1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). Generally, a reviewing court will affirm the ALJ's RFC findings when it is clear that she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 267–72 (4th Cir. 2017), and she built an "accurate and logical bridge from that evidence to [her] conclusion" that the claimant is not disabled, *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (quotation marks and other brackets omitted). *See*

---

[7] "Symptoms" are the claimant's own description of his medical condition. 20 C.F.R. §§ 404.1502(i); 416.902(n).

13

*Thomas v. Berryhill*, 916 F.3d 307, 311–12 (4th Cir. 2019); *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 662 (4th Cir. 2017).

Here, it is not clear that ALJ Munday considered all the relevant evidence. Her summary of James's medical evidence briefly discusses James's cardiac health issues and notes that James had "spinal surgery involving laminectomy and fusion in March 2018." R. 15. It also mentions that after the surgery, James "initially complained of neck stiffness, right side numbness or tingling, and leg pain with prolonged standing" and "reported little relief from a prior epidural steroid injection." *Id.* Nonetheless, ALJ Munday's summary notes that James's post-operative examinations "were generally unremarkable," that imaging showed post-surgical changes without complications, that James "reported being very pleased with his surgery and recovery," that surgery "resolved his arm pain and numbness," and that James's doctors encouraged him to pursue physical therapy. *Id.*

This summary of the medical evidence suffers from two key flaws. First, it fails to even mention James's pre-operative lumbar impairments. As I have recounted in detail, *see supra* Part III.A.1., James began complaining of lower back pain and associated right leg pain, weakness, heaviness, and numbness in June 2017. R. 493. A spinal MRI taken that month revealed "[b]road-based disc bulge with cranial and caudal migration at the L4-5 level" and "resulting severe bilateral neuroforaminal narrowing with findings concerning for a lateral exiting nerve root compression," for which a surgical consultation was recommended. R. 503. James continued to report similar symptoms throughout Summer 2017, R. 489, 491, and Nurse Scarce observed that he ambulated and changed positions slowly and cautiously, R. 491. She gave him a steroid injection, prescribed prednisone, and determined that James urgently needed an appointment with an orthospinal specialist. R. 489–91. James repeated the same concerns when he presented

14

to Dr. Carstensen at UVA in October 2017. *See* R. 473. Dr. Carstensen acknowledged James's concerns and prescribed a steroid injection, noting that surgery "might be an option down the road" after attempting conservative treatment. R. 475–76. ALJ Munday's discussion of the medical evidence does not mention any of this medical evidence. Instead, it focuses on James's cervical spinal impairments. Undoubtedly, his cervical impairments were significant and caused Dr. Hassanzadeh to order cervical spinal surgery to alleviate spinal cord compression and avoid the risk of paralysis. *See* R. 479, 483. But ALJ Munday should have considered all the relevant medical evidence, including that pertaining to James's cervical *and* lumbar impairments. *See Paxton v. Astrue*, No. 1:11cv70, 2012 WL 3011017, at *1 (W.D. Va. July 23, 2012) (Jones, J.) ("Before a court may find that an ALJ's decision is supported by substantial evidence, the ALJ's decision must analyze all the relevant evidence and sufficiently explain his findings and rationale.").

Second, ALJ Munday's summary of James's post-operative course of treatment and recovery mischaracterizes the evidence. Without distinguishing between his cervical and lumbar impairments, ALJ Munday stated that James had "spinal surgery," that subsequent imaging and examinations showed no complications or abnormalities, and that James was "very pleased with his surgery and recovery." R. 15. Indeed, James's cervical surgery went well and Dr. Hassanzadeh noted that James was pleased with the results. *See* R. 623. But ALJ Munday failed to mention that about four months after his surgery, James reported that his pre-operative symptoms were returning. R. 624 (noting left elbow "residual aching" and numbness, hand tingling, and "shooting" right lower extremity pain and aching (July 2018)); *see also* R. 755 (noting that although James "was initially doing very well after surgery," he now endorsed neck stiffness, right-sided numbness/tingling in the upper and lower extremities, right leg pain, and

15

difficulty standing for more than twenty minutes (Oct. 2018)). Dr. Hassanzadeh advised that James's "leg pain and standing intolerance [was] related to" his L4-L5 disc herniation, R. 756; *see also* R. 625; prescribed ESI treatments, R. 625; and noted that James's surgery "was indicated to slow the progression of the disease, not necessarily to make him better," *id.* Dr. Hassanzadeh also noted some positive or encouraging post-operative findings, observing that James's cervical X-Ray results did not show any complications and that James's myelopathy and pain did "seem to have improved." *Id.*; *see also* R. 756. Overall, ALJ Munday highlighted Dr. Hassanzadeh's positive notes and failed to discuss the fact that James's symptoms returned after surgery. To the extent she mentioned James's returning symptoms at all, she wrote that after surgery, James "*initially* complained of neck stiffness, right side numbness or tingling, and leg pain with prolonged standing" but had normal examination findings and was "very pleased with his surgery and recovery." R. 15 (emphasis added). The ALJ's recitation, however, gets the evidence backwards. Contrary to ALJ Munday's suggestion, the medical evidence shows that James *initially* reported few to no symptoms shortly after surgery. *See* R. 623. His symptoms *subsequently* returned, *see* R. 624–25, 755–56, 764, and ALJ Munday failed to account for that return. This was error. *Lewis*, 858 F.3d at 869 ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding.").

      The Commissioner contends that ALJ Munday sufficiently considered James's lumbar impairments because she determined that his back disorder did not meet or equal Listing 1.04. *See* Def.'s Br. 11–12 (citing R. 13), ECF No. 22. I disagree. ALJ Munday did determine that James's severe "back disorder" did not meet or equal a Listing for disabling disorders of the spine. R. 13. But even reading her opinion as a whole, *Smith v. Astrue*, 457 F. App'x 326, 328

16

(4th Cir. 2011), ALJ Munday's discussion of James's back impairments at step three simply stated that James could "walk without the use of assistive devices occupying both upper extremities" and that the "record" did not show "evidence of lumbar spinal arachnoiditis []or positive straight leg tests with loss of spinal range of motion, atrophy, and sensory or reflex loss." R. 13. This cursory discussion fails to demonstrate that ALJ Munday actually considered those lumbar impairments and related functional limitations that James *did* have when determining his RFC. "Of course, there may be reasons that the ALJ could have chosen to reject [James's] evidence and contentions regarding his low back pain" and resulting limitations. *Richardson v. Colvin*, No. 1:14cv913, 2016 WL 796039, at *4 (M.D.N.C. Feb. 26, 2016). But "if the ALJ considered and rejected this evidence, [s]he was required to 'say so and explain why.'" *Id.* (quoting *Carter v. Colvin*, No. 5:12cv736, 2104 WL 351867, at *7 (E.D.N.C. Jan. 31, 2014)). Overall, because ALJ Munday failed to discuss the medical evidence pertaining to James's lumbar herniated disc and associated symptoms and limitations in her decision; I cannot find that her decision is supported by substantial evidence. *Absher v. Saul*, 5:19cv172, 2021 WL 327639, at *4–6 (W.D.N.C. Feb. 1, 2021) (remanding because ALJ's failure to "discuss or reference certain significant portions of the Plaintiff's medical providers' reports" pertaining to her alleged peripheral artery disease and chronic venous insufficiency "frustrate[d] the Court's review" of the ALJ's RFC assessment); *Hewlett v. Berryhill*, No. 1:16cv1443, 2018 WL 836050, at *5 (M.D.N.C. Feb. 12, 2018) (remanding because ALJ failed to discuss the medical evidence regarding claimant's low back pain and "ultimately adopted an RFC of 'light work' based on Plaintiff's neck impairments . . . without any discussion of Plaintiff's low back pain or the alleged [associated] limitations in standing or walking").

17

IV. Conclusion

I take no position on whether James is entitled to disability benefits for the relevant period. But this Court must not "reflexively rubber-stamp [the] ALJ's findings." *Lewis*, 858 F.3d at 869. On remand, the ALJ must consider and apply the applicable legal rules to all the relevant evidence in the record; explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination; and, assuming James cannot prove he was disabled based on the medical evidence alone, provide a logical link between the evidence the ALJ found credible and the RFC determination.[8]

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** James's Motion for Summary Judgment, ECF No. 18, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 21, **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or

---

[8] Because James's first argument, alone, requires remand, I do not address his other arguments in detail. Nevertheless, because ALJ Munday failed to discuss the medical evidence concerning James's lumbar spinal impairments when evaluating his symptoms, *see* R. 14–15, the Commissioner should re-assess James's credibility on remand. Moreover, ALJ Munday noted that there were no medical opinions of record because the DDS physicians "found insufficient evidence" at the initial and reconsideration levels "and so did not render opinions." R. 16. This is partly accurate. DDS physicians evaluated James's DIB claim and declined to render an opinion as to his RFC because they explained that there was insufficient medical evidence to determine the severity of James's impairments before his DLI. *See* R. 53, 64. But for some reason, there are no DDS physician opinions in the record on James's SSI claim, which was filed *after* both the initial and reconsideration reviews on his DIB claim were completed. Assuming that DDS must have considered James's SSI claim (and denied it) before James's appeal from DDS's denial prompted ALJ Munday's review, the Commissioner must consider those medical opinions on James's SSI claim on remand.

18

specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: December 7, 2021

Joel C. Hoppe
United States Magistrate Judge